# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CATHRYN JEANNE BONNETTE,

    Plaintiff,

    v.

DISTRICT OF COLUMBIA COURT OF
APPEALS, *et al.*,

    Defendants.

Civil Action No. 11–1053 (CKK)

## MEMORANDUM OPINION
(July 13, 2011)

Plaintiff Cathryn Jeanne Bonnette ("Plaintiff" or "Bonnette"), a legally blind law school graduate, filed this action seeking to require Defendants District of Columbia Court of Appeals ("Court of Appeals") and National Conference of Bar Examiners ("NCBE") to allow her to take the July 2011 Multistate Bar Exam using a computer equipped with an accessible screen-reading program called JAWS (which stands for Job Access With Speech) that is commonly used by individuals with visual impairments. Plaintiff contends that the alternative accommodations offered by Defendants, which include providing a human reader or an audio CD with the exam, are not accessible to her and violate the requirements of the Americans with Disabilities Act ("ADA") and its implementing regulations. Presently pending before the Court are Plaintiff's [2] Motion for Issuance of Preliminary Injunction, Defendant Court of Appeals's [12] Motion for Summary Judgment, and Defendant NCBE's [10] Motion to Dismiss or for Summary Judgment. The parties have fully briefed these motions under an expedited briefing schedule, and therefore the motions are ripe for the Court's resolution.

Based on a searching review of the parties' motions, supporting declarations and exhibits, the applicable legal authorities, and the record as a whole, the Court shall deny Defendants' motions to dismiss and/or for summary judgment and grant Plaintiff's motion for preliminary injunction.

## I. BACKGROUND

*A.      The D.C. Bar Examination*

Individuals seeking to become licensed to practice law in the District of Columbia must become members of the District of Columbia Bar. The D.C. Court of Appeals created the Committee on Admissions (the "Committee") in April 1972 to oversee the D.C. Bar, and the Committee is responsible for certifying applications from attorneys for admission to the D.C. Bar, both by examination and without examination. Court of Appeals Stmt.[1] ¶ 1. The D.C. Bar Examination is conducted in February and July of every year. *Id.* ¶ 2. As in virtually every other jurisdiction in the United States, applicants for the D.C. Bar must complete the Multistate Bar Examination ("MBE"), a six hour examination consisting of 200 multiple-choice questions. *Id.* Applicants for the D.C. Bar also must complete the Multistate Performance Test ("MPT"), consisting of two 90-minute skills questions, and the Multistate Essay Examination ("MEE"), a collection of 30-minute essay questions. *Id.* All of these examinations are provided by the National Conference of Bar Examiners. *Id.*

---

[1] Pursuant to Local Civil Rule 7(h), motions for summary judgment must be accompanied by a statement of material facts as to which the moving party contends there is not a genuine issue, with references to the parts of the record relied on to support the statement. The Court shall cite to a party's Statement of Material Facts ("Stmt.") unless a statement is contradicted by the opposing party in its responding statement ("Resp. Stmt."). The Court shall also cite directly to evidence in the record, where appropriate.

NCBE is a non-profit organization that develops standardized examinations that jurisdictions can choose to purchase and administer as part of their bar examination process. NCBE Stmt. ¶ 9. The MBE is a secure, standardized examination developed and owned by NCBE that is administered in paper-and-pencil format. Decl. of Erica Moeser ("Moeser Decl.") ¶ 3(a). Forty-eight states and the District of Columbia use the MBE as a component of their state bar examinations. *Id.* ¶ 3(b). To ensure that scores achieved on different versions of the MBE taken at different times have the same meaning, a significant number of well-performing items that appeared on previous administrations of the test are embedded in each current test. *Id.* ¶ 3(c). In other words, NCBE reuses some of the questions from prior tests on each version of the MBE. This process, which NCBE calls "equating," allows NCBE to compare the performance of candidates on the current test to the performance of prior examinees. *Id.* Because of this practice, examination security is a critical part of administering the MBE. *Id.* If examination questions are compromised through unauthorized disclosure, they are retired and must be replaced with new questions. *Id.* It currently costs NCBE $300,000 and hundreds of hours of work by staff to develop a single form of an MBE exam. *Id.*

NCBE publishes its MBE test booklets several months prior to the February and July dates on which jurisdictions administer their bar examinations. Moeser Decl. ¶ 3(d). Jurisdictions such as the District of Columbia then order a certain number of test booklets from NCBE based on the number of individuals who have registered to take the exam. *Id.* NCBE sends the MBE test booklets to each jurisdiction, which then administers the MBE along with other components of the bar examination. *Id.* NCBE requires that administering jurisdictions comply with a strict set of security procedures set forth in a document captioned "MBE

Conditions of Use." *See* Decl. of Christopher Dix ("Dix Decl."), Ex. (MBE Conditions of Use). These procedures include: documenting a chain of custody for all test booklets and properly securing them at all times; preparing a seating plan that minimizes the possibility for communication between neighboring examinees; and screening all personnel before engaging them as supervisors or proctors. *Id.* at 1. NCBE requires that the test be administered no earlier than the last Wednesday of February or July, including any special accommodations required by the ADA. *Id.* at 2. NCBE rules prohibit examinees from bringing written material such as scratch paper or any personal belongings other than pencils to their seats when taking the MBE, require that examinees be seated in straight rows, and prohibit the use of a computer with the MBE. *Id.* at 3. These security protocols must be followed unless the jurisdiction obtains a separate written agreement from NCBE that describes an alternative practice that ensures the same level of security. *Id.*

NCBE makes all of its examinations (including the MBE, the MPT, the MEE, and the Multistate Professional Responsibility Examination ("MPRE")) available in several formats so that they can be administered to disabled individuals who cannot effectively access test content using standard examination booklets and answer sheets. Moeser Decl. ¶ 7(a). For visually impaired examinees, NCBE offers the following alternative formats for all of its examinations: (1) large print paper version, with text up to 72-point font also available in reverse white-on-black contrast; (2) paper version with closed circuit television magnification; (3) Braille version; (4) audio CD, to be played on a portable CD player with two available speeds, and with each question and set of answer choices on a separate track so that examinees can easily replay a question; and (5) using a human reader. *Id.* ¶ 7(b). Additionally, for examinations such as the

MPT and MEE where questions are disclosed after each administration, NCBE makes the

examination available on a disk that can be loaded onto a laptop computer and accessed using

magnification software (such as ZoomText) and/or screen reader software (such as JAWS). *Id.*

¶ 7(c). Between 2000 and 2010, jurisdictions have ordered approximately 484 audio versions of

the MBE (either audio CD or audio tape) and approximately 92 Brailled examination forms. *Id.*

¶ 7(d).

Applicants who seek testing accommodations on the D.C. Bar Examination must

complete an Eligibility Questionnaire and provide documentation supporting their claims of

disability and the need for an accommodation. Dix Decl. ¶ 8. The Eligibility Questionnaire

provides applicants with an outline to state the nature, history, and accommodations previously

afforded for the reported disability. *Id.* ¶ 9. Once this information has been provided, the

Committee on Admissions makes a decision on a case-by-case basis regarding what

accommodation(s) to provide. *Id.* ¶ 8. In the past five years, the Committee has received

approximately 125 requests for accommodations as a result of various disabilities, including

visual impairment. *Id.* ¶ 10. The Committee has received five requests in the last nine years

from visually impaired individuals, and those applicants were provided with a number of

accommodations, including Brailled and large print examinations, audio cassettes/CDs, double

time, reader assistance, extra lighting, and, for the MPT and MEE, permission to use a dictating

device and laptop computer. *Id.* No visually impaired person has ever been provided the use of

computer-based testing on the MBE portion of the examination. *Id.*

     B.     *Plaintiff and Her Visual Impairment*

Plaintiff Cathryn Bonnette is a highly-educated resident of Arlington, Virginia who has

applied to take the July 2011 administration of the D.C. Bar Examination. Decl. of Cathryn Bonnette ("Bonnette Decl.") ¶¶ 2, 8. Bonnette graduated from the University of Michigan with a B.A. in psychology in 1976 and earned a Masters of Divinity degree from Fuller Seminary in 1989. *Id.* ¶¶ 3, 5. Bonnette later completed a joint degree program in alternative dispute resolution at Pepperdine University, earning a J.D. in 2003 and an M.A. in 2005. *Id.* ¶¶ 6-7.

Approximately thirty years ago, Bonnette was diagnosed with retinopathy, and her vision has gradually and progressively deteriorated since that time. Bonnette Decl. ¶ 9. She has had total visual impairment in her right eye at least since childhood. Decl. of Alexis G. Malkin ("Malkin Decl.") ¶ 10. Currently, Bonnette has no light perception in either eye and is totally blind. Bonnette Decl. ¶¶ 9-10. Because of her blindness, Bonnette can no longer read standard print. *Id.* ¶ 11. In the early 1990s, Bonnette began using JAWS to supplement her deteriorating vision. *Id.* ¶ 13. JAWS, which stands for Job Access With Speech, is screen access software that reads aloud the text on a computer screen and allows a user to independently navigate through the text using a keyboard. *Id.* ¶ 12. JAWS software allows Bonnette to use key commands to quickly and easily navigate through a document independently, skim text, jump to a particular section or passage in a document, repeat a word or sentence, spell words, control the reading speed, and have independent, non-visual access to reading in a manner that mimics the experience she enjoyed before she lost her vision. *Id.* By 2001, Bonnette could no longer rely upon her vision to supplement her ability to read text with auditory methods. *Id.* ¶ 14. Accordingly, Bonnette transitioned to the exclusive use of JAWS for reading text, and it is the primary method she uses to read for work and school, to study for the bar exam, and to perform nearly all academic, technical, and other lengthy reading. *Id.*

Because Bonnette learned to read visually, she is primarily a visual learner. Malkin Decl. ¶ 12. The techniques Bonnette uses when operating JAWS emulate the processes she used before she lost her vision. *Id.* When Bonnette uses JAWS, she spends considerable energy listening to JAWS describe information about the page layout and how the text is structurally organized. *Id.* This allows Bonnette to visualize a picture of the page and general layout of the text in her mind. *Id.* According to Dr. Alexis G. Malkin, an optometrist who has evaluated Bonnette, she would be at a significant loss if she had to rely on serial auditory input of text without any ability to efficiently conceptualize the page layout or structure of the text that she needs in order to fully comprehend the material. *Id.* ¶ 13.

According to Fredric K. Schroeder, a research professor at San Diego State University who works in the field of vocational rehabilitation, screen reading software has become an essential auxiliary aid for blind individuals in today's technology-driven society. *See* Decl. of Fredric K. Schroeder ("Schroeder Decl.") ¶ 28. Schools, employers, vocational rehabilitation professionals, and institutions widely provide this accommodation to blind individuals. *Id.* Dr. Schroeder explains that the functionality of screen access software can provide greater efficiency, proficiency, automaticity, privacy, and independence than the use of a human reader. *Id.* Dr. Schroeder further explains that the process of learning to read with a human reader takes extensive practice and training. *Id.* ¶ 21. Dr. Schroeder states that most blind individuals who are computer proficient and who did not learn Braille as a child are advised to use screen access software as a primary reading method. *Id.* ¶ 22. Screen access software can be customized to meet each reader's specific needs. For example, an individual who was primarily a visual reader and learner before losing her vision may rely on screen access software that offers some visual

input in conjunction with auditory output. *Id.* ¶ 23. For such readers, transitioning to solely audio intake can take months or even years. *Id.* Once a blind person develops proficiency using screen access software, the process of reading becomes automatic, allowing the reader to concentrate on acquiring the content of the information rather than focusing on the process of how to read. *Id.* ¶ 24.

C.      *Plaintiff's Past Use of Auxiliary Aids*

While Bonnette was in law school between 2001 and 2003, she was offered only human readers as an accommodation for examinations, despite the fact that JAWS was her primary reading method. Bonnette Decl. ¶ 18. Bonnette believes that her grades from law school reflected her inability to read examination text using human readers. *Id.* By contrast, in her other graduate studies at Pepperdine, Bonnette was able to use JAWS to write complex papers and work on assigned projects. *Id.* ¶ 19. Bonnette believes that her grades from her graduate program more accurately reflect her actual abilities rather than her inability to read text. *Id.* Prior to law school, Bonnette used a human reader to take the Law School Admission Test ("LSAT"). *See* Bonnette Decl., Ex. C at 44.

In November 2001 and again in August 2002, Bonnette took the MPRE, which was administered by NCBE through a contractor. Moeser Decl. ¶ 9(b). To accommodate her visual impairment during the November 2001 examination, Bonnette was provided with a human reader, a private testing room, stop-the-clock breaks, and double testing time. *Id.* ¶ 9(c). For the August 2002 administration, Bonnette was provided with a human reader, a private testing room, a transcriber/writer, and double testing time. *Id.* On the August 2002 MPRE, Bonnette achieved a score sufficient to qualify for admission to the bar in every jurisdiction that requires the MPRE.

*Id.* ¶ 9(d).  On the November 2001 MPRE, she achieved a score that would qualify in some but not all jurisdictions.  *Id.*

Bonnette took the California Bar Examination four times between July 2003 and July 2005, during which she was required to use a human reader as an accommodation.  Bonnette Decl. ¶ 20; Moeser Decl. ¶ 9(e).  According to NCBE's records, Bonnette's scaled score on the MBE portion of those examinations ranged from 132 to 142.  Moeser Decl. ¶ 9(e).  To successfully pass the D.C. Bar Examination, applicants must achieve a total scaled score of 266 or greater, which is an average scaled score of 133 on the MBE and on the essay portion.  *See* D.C. Ct. App. R. 46(b)(10)(i).  Bonnette did not successfully pass the California Bar Examination.  Bonnette Decl. ¶ 20.  Bonnette believes that her failure to pass was due in part to her inability to effectively read the content of the examination.  *Id.*  Since last taking that test in July 2005, Bonnette has not had the opportunity to work with a human reader in the context of testing.  *Id.*

Bonnette found it very difficult, frustrating, and humiliating to work with human readers on the California Bar Examination and during her law school examinations.  Bonnette Decl. ¶ 22.  According to Bonnette, human readers often misunderstood what, where, and how she wanted them to read, mispronounced or misread words, and suddenly halted their speech when they encountered a technical legal term with which they were unfamiliar.  *Id.*  Bonnette also found that the performance of a human reader deteriorated over the long hours of reading required for the bar examination.  *Id.*  In addition, Bonnette explained that human readers often had difficulty reading when she requested that they read consecutive sentences in reverse order.  *Id.*  These imperfections and problems ultimately caused Bonnette to break her concentration and shift her

attention to the performance of the reader. *Id.*

After graduating from Pepperdine, Bonnette worked as a program specialist with the Department of Veterans Affairs and as a project coordinator with the National Association of Guide-Dog Users. Bonnette Decl. ¶ 21. Bonnette relied on JAWS for the vast majority of her work-related reading. *Id.* Bonnette did use human readers, however, to fill out forms and read small amounts of hand-written material where the length of text to be read was no more than a few pages. *Id.*

Bonnette has never used an audio CD to take an examination. Bonnette Decl. ¶ 17. Bonnette claims that she is not familiar with that method of reading, and therefore she would not be able to precisely operate the controls to read by character, word, phrase, line, sentence, paragraph, and page. *Id.* Although Bonnette has had minimal instruction in Braille, she does not have the Braille skills necessary to read complex or academic text in an examination setting. *Id.* ¶ 15.

D. *Plaintiff's Request for Accommodations on the D.C. Bar Examination*

On or about December 29, 2010, Bonnette submitted a request for testing accommodations for the February 2011 administration of the D.C. Bar Examination. Bonnette Decl. ¶ 27. Bonnette submitted documentation of her disability and asked for the following accommodations: (1) use of a laptop computer with a word processor and JAWS for Windows speech software to read aloud the text of examination questions and to write outlines in organizing essay responses; (2) double time; (3) a separate testing room; (4) a scribe to fill out required paper work or computerized answer sheets that require ovals to be filled in using a pencil; and (5) stopped bottles of drinking water available as needed in arms length of the

keyboard. *Id.*, Ex. C at 46-47. The Committee granted Bonnette's requests with respect to the MEE and MPT portions of the D.C. Bar Examination. *Id.* ¶ 28. With respect to the MBE, the Committee granted Bonnette's request for double time, a separate testing room, a scribe, and told her that she could bring in her own water as well as her own ergonomic chair. *Id.*, Ex. D. However, the Committee denied Bonnette's request to use a laptop equipped with JAWS for the MBE because it was not permitted by NCBE. *Id.*; Dix Decl. ¶ 14. The Committee offered Bonnette the use of an audio CD or a human reader who is an attorney. Bonnette Decl., Ex. D.

Because Bonnette did not feel comfortable with the proposed human reader or audio CD accommodations, Bonnette withdrew from the February 2011 administration and told the Committee that she planned to take the examination in July 2011. Bonnette Decl. ¶ 29; Dix Decl. ¶ 15. Bonnette submitted her application for the July 2011 examination on May 10, 2011, again requesting the use of a computer with JAWS as an accommodation for her disability. Bonnette Decl. ¶ 30; Dix Decl. ¶ 16. After a series of negotiations between the Committee and Bonnette's counsel, the Committee offered Bonnette the following accommodations for the July 2011 MBE: audio CD, live reader, and Brailled or large print versions. Dix Decl. ¶ 16. The Committee has also offered to provide Bonnette with a sample CD in advance of the examination so that she can practice with it; to allow Bonnette to meet with the attorney who would serve as a reader in advance of the examination; additional testing time beyond the double time requested; and additional rest breaks. *Id.* ¶ 17. NCBE has declined to allow the use of JAWS on the MBE even if the Committee reimburses NCBE for any costs associated with such accommodation. *Id.* ¶ 18.

NCBE has had no interactions with Bonnette in connection with any request for

accommodation she has made for the D.C. Bar Examination, including the MBE.  Moeser Decl. ¶ 9(f).  NCBE is not involved in processing or evaluating applications to take the D.C. Bar Examination or deciding individuals requests for accommodations on the exam.  *Id.* ¶ 8.

Bonnette has worked hard for many years to prepare for the practice of law.  Bonnette Decl. ¶ 35.  Practicing law is Bonnette's dream and chosen professional goal, and she is unwilling to accept inaccurate assessments of her actual abilities based on her capacity to read using methods other than her primary reading method.  *Id.*  Bonnette feels that she will be humiliated and frustrated if she is forced to take the MBE using a reading method other than JAWS, as she was required to do during law school and on the California Bar Exam.  *Id.*  Bonnette has set aside most of the summer to study for the July 2011 administration of the D.C. Bar Examination.  *Id.* ¶ 36.  She is enrolled in a bar preparation class and has been diligently studying for the exam.  *Id.*  Bonnette is foregoing income by studying and preparing full time for the exam rather than locating employment opportunities outside the legal field.  *Id.*

E.     *Administration of the MBE Using JAWS*

In July 2008, NCBE conducted a pilot program involving a single examinee in California to offer the MBE on an NCBE-owned laptop loaded with JAWS.  Moeser Decl. ¶ 10(b)(i).  The pilot program was expanded in July 2009 to include two examinees in North Carolina and one in California.  *Id.*  After reviewing the pilot program, NCBE concluded that it was not currently feasible to expand the program on a large scale.  *Id.* ¶ 10(b)(ii).  NCBE believes that there are significant, unavoidable security risks relating to administering secure, paper-and-pencil examinations on laptop computers.  *Id.*  Specifically, NCBE is concerned that there is not a sufficiently secure way to administer the exam via laptop unless NCBE provides its own laptops.

*See id.* ¶ 11.  NCBE believes that if it allowed examinees to use their own laptops, it could not effectively prevent test questions from being copied onto the hard drive of the laptops or ensure that the laptops were wiped clean of the test questions after the examination.  *Id.* ¶ 11(b).  NCBE also believes that some security risks will remain even if NCBE provides its own laptops because laptops will be in the custody of the administering jurisdiction, and NCBE cannot keep track of whether the examination is copied electronically.  *Id.* ¶ 11(c)-(e).  NCBE acknowledges that there are also security risks with administering paper versions of the MBE.  *Id.* ¶ 11(d).  According to Michael Shamos, Distinguished Career Professor in the School of Computer Science at Cargenie Mellon University, who has extensive experience with electronic voting systems, the security concerns raised by NCBE can be easily remedied through precautions such as password encryption and observation by proctors.  *See* Decl. of Michael Shamos ¶¶ 27-37.  Professor Shamos believes that with these precautions, it would be virtually impossible for the security of the MBE to be compromised without the collusion of the examiners—a risk that is equally present for paper-based examinations.  *Id.* ¶ 38.

In 2009, one visually impaired examinee in California, Stephanie Enyart, sued NCBE, seeking to take the MBE and the MPRE on a laptop computer using both JAWS and ZoomText, a screen magnification software program.  Moeser Decl. ¶ 10(c).  The district court in California granted a preliminary injunction requiring NCBE to offer the MBE and MPRE in her requested format.  *Id.*  After she failed both examinations, the district court granted her a second preliminary injunction.  *Id.*  The Ninth Circuit affirmed the district court's issuance of the injunctions.  *See Enyart v. Nat'l Conference of Bar Examiners*, 630 F.3d 1153 (9th Cir. 2011).  Three visually impaired examinees filed a similar lawsuit in 2010 in the District of Maryland, but

the court orally denied their request for a preliminary injunction. Moeser Decl. ¶ 10(c). One of those examinees filed a second suit in California seeking accommodations on the California bar examination, and the district court granted his request for a preliminary injunction. *See Elder v. Nat'l Conference of Bar Examiners*, No. C-11-00199, 2011 WL 672662 (N.C. Cal. Feb. 16, 2011). NCBE offered the MBE pursuant to these injunctions.

NCBE contends that there are significant costs associated with loading software onto additional computers, ensuring their accuracy, and explaining the process to administering jurisdictions. Moeser Decl. ¶ 10(b)(ii). NCBE has calculated that providing an NCBE laptop for the MBE costs approximately $5000 per examinee, including the cost of hardware, software, shipping, and time devoted by NCBE's testing and IT staff. *Id.* ¶ 12(a). In fiscal year 2010, NCBE had approximately $12.3 million in income and its expenses totaled $12.1 million. *Id.* ¶ 14. The Court of Appeals offered to reimburse NCBE for the cost of administering the MBE to Bonnette with JAWS, but NCBE declined. Dix Decl. ¶ 18. The Court of Appeals received an operations budget of $185,660,000 in fiscal year 2011. Decl. of Julio Castillo ¶ 4.

> F.   *The Importance of Offering Plaintiff the Opportunity to Take the MBE with JAWS*

In support of her motion for a preliminary injunction, Bonnette has provided the Court with declarations from a variety of experts who believe that only screen access software such as JAWS will allow Bonnette to perform effectively on the MBE. For example, Dr. Malkin believes that based on his review of Bonnette, a human reader or audio CD would not provide Bonnette with effective access to the MBE. Malkin Decl. ¶ 14. Dr. Malkin explains that neither a human reader nor an audio CD would permit Bonnette to precisely navigate backwards or forwards by character, word, sentence, paragraph or page as she currently does when reading

with JAWS.  *Id.* ¶¶ 17-18.  Therefore, it is the professional opinion of Dr. Malkin that only screen access software such as JAWS will allow Bonnette to access the MBE and best ensure that her results on the examination will accurately reflect her aptitude rather than her disability.  *Id.* ¶ 19.

Dr. Bruce Britton, Professor Emeritus of Cognitive Psychology at the University of Georgia, has also evaluated Bonnette.  *See* Decl. of Bruce Britton ("Britton Decl.") ¶ 5.  He has observed her using JAWS and believes that she is fluent with the program.  Britton Decl. ¶ 8.  He explains that Bonnette uses JAWS to adjust the speed with which the program vocalizes text as she reads, slowing down to enhance comprehension.  *Id.*  In reading and analyzing a multiple choice question with a list of answers following it, Bonnette uses key commands to jump from an answer choice back to the question, skipping over answers she has already ruled out.  *Id.*  Dr. Britton explains that the complexity of the process necessary to solve questions on the MBE makes it essential for Bonnette to have facilities that are of nearly equivalent functionality as those afforded to a sighted reader.  *Id.* ¶ 10.  Dr. Britton believes that JAWS will best ensure that Bonnette's test results accurately reflect her aptitude rather than reflecting Ms. Bonnette's sensory impairment.  *Id.*

Dr. Britton explains that the problem-solving skills tested by the MBE require a large number of regressions, or "look-backs," at previously encountered text elements, many more than ordinary text.  Britton Decl. ¶¶ 11-12.  Dr. Britton explains that regressions are important for the MBE because the test requires examinees to hold together in their minds different elements from widely separated parts of the text to analyze a single complex problem.  *Id.* ¶ 13.  Dr. Britton explains that memory decay processes begin to occur immediately after a text element is

processed, and the amount of decay is proportional to the amount of time that has passed and the amount of intervening material. *Id.* Therefore, slower regressing movement will result in more decay and interference, leading to lower performance levels. *Id.* Furthermore, Dr. Britton explains that the brain's working memory—which is used to perform a series of mental operations such as verbal comprehension, comparison, memory retrieval, and judging—has less capacity than is required to solve questions on the MBE. *Id.* ¶¶ 15-16. Therefore, an examinee must often refer back to the text in solving each question. *Id.* ¶ 16. The process of evaluating each answer choice requires the same sort of regressions because each possible answer may require the content of the question to be processed in a different context. *Id.* ¶ 17.

Dr. Britton explains that for a visual reader who can see text, regressions are accomplished by nearly instantaneous eye movements, so very little memory decay occurs. Britton Decl. ¶ 18. When Bonnette uses screen access software such as JAWS, regressions occur by rapid keystrokes with adjustments, so a moderate amount of memory decay occurs. *Id.* If a human speaker is used to read text to Bonnette, regressions occur much more slowly because Bonnette must first formulate a request to regress, communicate that to the speaker, allow for the speaker to interpret the request, and then carry out the request. *Id.* The amount of time lost through this process is substantial. *Id.* Dr. Britton opines that even more time would be lost using an audio CD because the process of scanning with fast-forward or rewind functions is less precise than verbal commands given to a human reader. *Id.* ¶ 21.

Dr. Britton also explains that sighted readers have the advantage of being able to visually skim through text, a process that can be achieved through the use of JAWS but not with a human reader. Britton Decl. ¶ 19. Dr. Britton further explains that when a skill is practiced intensively

over long periods of time, it becomes automatized. *Id.* ¶ 20. Automatized reading requires less working memory capacity and leaves more capacity available for other aspects of the task. *Id.* Therefore, to the extent that Bonnette has practiced reading with JAWS but not other alternative reading methods, her reading will be more automatized. *Id.* Dr. Britton believes that the additional cognitive demands of using a reading method other than her primary reading method would negatively affect Bonnette's test performance compared to her peers. *Id.* ¶ 33. Based on these observations, Dr. Britton concludes that screen access software such as JAWS is the only reasonable accommodation that would best ensure that her results on the MBE will accurately reflect her aptitude rather than her disability. *Id.* ¶ 34.

## II. LEGAL STANDARD

### A. Motion for Preliminary Injunction

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 129 S. Ct. 365, 376 (2008). A plaintiff seeking a preliminary injunction must establish (1) that she is likely to succeed on the merits, (2) that she is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of the equities tips in her favor, and (4) that an injunction would be in the public interest. *Id.* at 374. "The four factors have typically been evaluated on a 'sliding scale.'" *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291 (D.C. Cir. 2009). Under this sliding scale, "[i]f the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor." *Id.* at 1291-92.

"It is particularly important for the [movant] to demonstrate a substantial likelihood of

17

success on the merits." *Barton v. District of Columbia,* 131 F. Supp. 2d 236, 242 (D.D.C. 2001) (citing *Benten v. Kessler*, 505 U.S. 1084, 1085 (1992)). If the movant fails to do so, inquiry into the remaining factors is unnecessary, for the injunctive relief must be denied on that ground alone. *See Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 614 (D.C. Cir. 1992) (affirming denial of preliminary injunction where the district court properly concluded that the plaintiff had "no likelihood of success on the merits"); *Katz v. Georgetown Univ.*, 246 F.3d 685, 688 (D.C. Cir. 2001) ("[A]lthough we apply a four-factor test in weighing a request for a preliminary injunction, such relief never will be granted unless a claimant can demonstrate 'a fair ground for litigation.'") (quoting *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977); *Taylor v. Resolution Trust Corp.*, 56 F.3d 1497, 1507 (D.C. Cir.) ("Given the inadequacy of [plaintiff]'s prospects for success on the merits, there may be no showing of irreparable injury that would entitle him to injunctive relief."), *amended on other grounds on reh'g*, 66 F.3d 1226 (D.C. Cir. 1995). In addition, the movant must establish that irreparable injury must be likely, "not just a possibility." *Winter v. Natural Res. Def. Council, Inc.*, 129 S. Ct. 365, 375 (2008).

     B.     *Motion to Dismiss*

Under the Federal Rules of Civil Procedure, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. (8)(a), "in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion to dismiss for failure to state a claim, a plaintiff must furnish "more than

labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Id.* "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 557). Rather, a complaint must contain sufficient factual allegations that, if accepted as true, "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S.Ct. 1949 (citing *Twombly*, 550 U.S. at 556).

When considering a motion to dismiss for failure to state a claim, the court "must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam). "The complaint must be liberally construed in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged." *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979) (internal quotation marks omitted). However, a plaintiff must provide more than just "a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 129 S.Ct. at 1950. When a complaint's well-pleaded facts do not enable a court, "draw[ing] on its judicial experience and common sense," "to infer more than the mere possibility of misconduct," the complaint has not shown that the pleader is entitled to relief. *Id.*

C.    *Motion for Summary Judgment*

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials); or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e). When considering a motion for summary judgment, the court may not make credibility determinations or weigh the evidence; the evidence must be analyzed in the light most favorable to the nonmoving party, with all justifiable inferences drawn in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "If material facts are at issue, or, though undisputed, are susceptible to divergent inferences, summary judgment is not available." *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009) (citation omitted).

The mere existence of a factual dispute, by itself, is insufficient to bar summary judgment. *See Liberty Lobby, Inc.*, 477 U.S. at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* For a dispute about a material fact to be "genuine," there must be sufficient admissible evidence that a reasonable trier of fact could find for the nonmoving party. *Id.* The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. "If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted). The adverse party must

"do more than simply show that there is some metaphysical doubt as to the material facts."

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Conclusory

assertions offered without any factual basis in the record cannot create a genuine dispute. *See*

*Ass'n of Flight Attendants-CWA v. U.S. Dep't of Transp.*, 564 F.3d 462, 465-66 (D.C. Cir. 2009).

## III. DISCUSSION

Bonnette contends that the Court of Appeals and the NCBE are required by the

Americans with Disabilities Act and its implementing regulations to let her take the MBE using a

computer equipped with JAWS. Defendants disagree with Bonnette's interpretation of the ADA

and contend that the accommodations they have offered her, particularly the option of using a

human reader or an audio CD, are adequate as a matter of law. Additionally, Defendant NCBE

contends that the ADA's accessibility mandate does not apply to it because it is not the entity that

is offering the MBE to Bonnette. Because of the emergency nature of the relief requested by

Bonnette, the Court shall analyze the four factors relevant to Bonnette's motion for preliminary

injunction and address Defendants' dispositive motions in the context of the first prong of the

analysis.

### A. *Likelihood of Success on the Merits*

#### 1. The ADA and Governing Regulations

The Americans with Disabilities Act is broadly aimed at eliminating discrimination

against individuals with disabilities. *See* 42 U.S.C. § 12101(b)(1). Title II of the ADA prohibits

discrimination in the provision of public services by state and local governments (including the

District of Columbia), *see* 42 U.S.C. §§ 12131-12165, and Title III of the ADA prohibits

discrimination in public accommodations and certain services operated by private entities, *see id.*

21

§§ 12181-12189. Specifically, Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity." *Id.* § 12132. Implementing regulations promulgated by the Department of Justice further clarify public entities' obligations under the ADA:

> A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability—
>
> . . .
>
> Provide a qualified individual with a disability with an aid, benefit, or service that is not *as effective* in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others[.]

28 C.F.R. § 35.130(b)(1) (emphasis added).

> A public entity may not administer a licensing or certification program in a manner that subjects qualified individuals with disabilities to discrimination on the basis of disability, nor may a public entity establish requirements for the programs or activities of licensees or certified entities that subject qualified individuals with disabilities to discrimination on the basis of disability.
>
> . . .
>
> A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

*Id.* § 35.130(b)(6)-(7).

> (a)(1) A public entity shall take appropriate steps to ensure that communications with applicants, participants, members of the public, and companions with disabilities are *as effective* as communications with others.
>
> . . .
>
> (b)(1) A public entity shall furnish appropriate auxiliary aids and services where

necessary to afford individuals with disabilities, including applicants, participants, companions, and members of the public, an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity.

(2) The type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place. In determining what types of auxiliary aids and services are necessary, a public entity shall give primary consideration to the requests of individuals with disabilities. In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability.

*Id.* § 35.160 (emphasis added). These implementing regulations must be "given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984). The parties agree that these provisions apply to the Court of Appeals as a public entity.

Title III of the ADA also contains a provision that specifically addresses examinations such as the Multistate Bar Exam: "Any person that offers examination or courses related to applications, licensing, certification, or credentialing for secondary or post-secondary education, professional, or trade purposes shall offer such examinations or courses in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals." 42 U.S.C. § 12189. The Court of Appeals argues that it is not a "person" within the meaning of this provision and that the placement of this provision in Title III rather than Title II suggests that the provision does not apply to public entities. However, "[a]lthough Title III generally applies only to private entities, the examination provision has unanimously been held to apply to public entities, and specifically to state bar examinations." *Bartlett v. N.Y. State Bd. of Law Examiners*, 970 F. Supp. 1094, 1128-29 (S.D.N.Y. 1997) (Sotomayor, J.), *vacated in part*

*on other grounds*, 226 F.3d 69 (2d Cir. 2000). This interpretation is consistent with the definition of "person" in Title I of the ADA, which includes public entities. *See* 42 U.S.C. § 12111(7). Furthermore, the language of § 12189 is consistent with the nondiscrimination mandate in Title II and its accompanying regulations. *Accord* Nondiscrimination on the Basis of Disability in State and Local Government Services, 75 Fed. Reg. 56,164, 56,236 (Sept. 15, 2010) (stating the Justice Department's position that public entities are also covered by § 12189). Therefore the Court holds that § 12189 applies to the Court of Appeals.

2.     NCBE's Motion to Dismiss

NCBE contends that § 12189 does not apply to it because it does not "offer" the MBE within the meaning of the statute. NCBE argues that it is the Court of Appeals that "offers" the MBE because the Court of Appeals administers the examination and NCBE is merely a vendor that provides testing materials. NCBE has moved to dismiss the claim asserted against it on this basis. Both Plaintiff and the Court of Appeals oppose NCBE's motion to dismiss. As the Court of Appeals points out in its opposition brief, NCBE imposes strict conditions on the use of the MBE for the D.C. Bar Exam, which includes prohibitions on the use of a computer. As a practical matter, the facts suggest that NCBE "offers" the MBE in conjunction with the Court of Appeals for purposes of the D.C. Bar Exam. NCBE interprets the "place and manner" language in § 12189 as applying only to aspects of test administration (such as site selection or eligibility criteria) that are separate from the actual testing procedure. But that narrow interpretation is not supported by the Justice Department's implementing regulation, 28 C.F.R. § 36.309, which states in part that "[r]equired modifications to an examination may include changes in the length of time permitted for completion of the examination and adaptation in the manner in which the

examination is given." 28 C.F.R. § 36.309(b)(2). Therefore, to the extent that NCBE exercises control over the manner in which the examination is given, it is subject to § 12189.[2] The Court shall deny NCBE's motion to dismiss because the question of whether NCBE offers the MBE is a factual one not appropriate for resolution through Rule 12(b)(6).[3] Furthermore, based on the record presently before the Court, it appears that Plaintiff is likely to establish that NCBE offers the MBE for purposes of § 12189.

3.      The "Best Ensure" Regulation

The parties have focused much of their briefing on the implementing regulation for § 12189, which reads in relevant part as follows:

(1) Any private entity offering an examination covered by this section must assure that—

(i) The examination is selected and administered so as to *best ensure* that, when the examination is administered to an individual with a disability that impairs sensory, manual, or speaking skills, the examination results accurately reflect the individual's aptitude or achievement level or whatever other factor the examination purports to measure, rather than reflecting the individual's impaired sensory, manual, or speaking skills (except where those skills are the factors that the examination purports to measure);

. . .

(2) Required modifications to an examination may include changes in the length of time permitted for completion of the examination and adaptation in the manner in which the examination is given.

---

[2] NCBE also suggests that § 12189 applies only to "public accommodations" as defined in Title III of the ADA and argues in the alternative that Title III regulations applicable to public accommodations would not require NCBE to alter or modify the goods or services it offers. *See* NCBE Br. at 16-18. However, § 12189 clearly applies to "any person" that offers examinations, not just public accommodations. Therefore, the Title III regulations governing public accommodations have no direct bearing on the legal issue presently before the Court.

[3] In addition, Plaintiff has requested the opportunity to engage in discovery on this issue.

(3) A private entity offering an examination covered by this section shall provide appropriate auxiliary aids for persons with impaired sensory, manual, or speaking skills, unless that private entity can demonstrate that offering a particular auxiliary aid would fundamentally alter the measurement of the skills or knowledge the examination is intended to test or would result in an undue burden. Auxiliary aids and services required by this section may include taped examinations, interpreters or other effective methods of making orally delivered materials available to individuals with hearing impairments, Brailled or large print examinations and answer sheets or qualified readers for individuals with visual impairments or learning disabilities, transcribers for individuals with manual impairments, and other similar services and actions.

28 C.F.R. § 36.309(b) (emphasis added). By its own terms, this regulation applies only to private entities such as NCBE. However, the Justice Department has explained that the Title III regulation is "useful as a guide for determining what constitutes discriminatory conduct by a public entity in testing situations." *See* Nondiscrimination on the Basis of Disability in State and Local Government Services, 75 Fed. Reg. at 56,236 (Sept. 15, 2010). Accordingly, the language in 28 C.F.R. § 36.309 is persuasive if not binding authority regarding the Court of Appeals's obligations to offer the MBE in an accessible manner. With respect to NCBE, however, the Court must defer to the Justice Department's regulation interpreting the requirements of § 12189. *Chevron*, 467 U.S. at 844. The Court disagrees with NCBE's argument that the "best ensure" requirement in the regulation exceeds the clear limits of the ADA and is not entitled to deference; the statutory requirement that examinations be offered "in a place and manner accessible to persons with disabilities" is sufficiently ambiguous that the Court must respect the Justice Department's interpretive regulations. *See Enyart v. Nat'l Conf. of Bar Examiners*, 630 F.3d 1153, 1161-62 (9th Cir. 2011).

### 4. Defendants' Motions for Summary Judgment

Defendants contend that the accommodations they have offered Bonnette—which include

using a human reader or an audio CD with extra time—are adequate as a matter of law and therefore they should be awarded summary judgment. Defendants point to the fact that their offered alternatives are included on the lists of auxiliary aids specifically described in the ADA and its implementing regulations. *See* 42 U.S.C. § 12103(1) (defining "auxiliary aids and services" as including "qualified readers, taped texts, or other effective methods of making visually delivered materials available to individuals with visual impairments"); 28 C.F.R. § 36.309(b)(3) (including "taped examinations" and "Brailled or large print examinations and answer sheets or qualified readers for individuals with visual impairments" as auxiliary aids and services that may be required). However, these lists are illustrative, not exhaustive, and the fact that other qualified individuals with visual impairments may have used them does not mean that they are accessible to Plaintiff as a matter of law. *See* 42 U.S.C. § 12103(1) (including "other similar services and actions" within definition of "auxiliary aids and services"); 28 C.F.R. § 36.309(b)(3) (same). As the Ninth Circuit recently explained in *Enyart v. Nat'l Conference of Bar Examiners*, "[t]o hold that, as a matter of law, an entity fulfills its obligation to administer an exam in an accessible manner so long as it offers some or all of the auxiliary aids enumerated in the statute or regulation would be inconsistent with Congressional intent." 630 F.3d at 1163-64. The legislative history suggests that Congress explicitly contemplated that the auxiliary aids and services provided to individuals with disabilities would "keep pace with the rapidly changing technology of the times." *Id.* at 1164 (quoting H.R. Rep. No. 101-485(II), at 108 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 391).

Defendants also contend that they are entitled to judgment as a matter of law because their proffered accommodations were approved by the Justice Department in the context of

settlement agreements with other testing entities. NCBE cites *SBC Communications Inc. v. FCC*, 407 F.3d 1223 (D.C. Cir. 2005), for the proposition that the courts "treat settlements between an agency and a private party as equivalent to agency regulations for deference purposes." *Id.* at 1230. However, that case involved the FCC's interpretation of its own prior settlement agreement with the litigant at issue, not a settlement agreement that was applied to bind the actions of third parties. The Justice Department's decision to settle a regulatory violation with a third party does not establish a definitive interpretation of that regulation to which this Court owes deference.

Defendants argue that the ADA requires only that they provide a "reasonable" accommodation to make the MBE accessible to Bonnette. Defendants rely primarily on *Fink v. N.Y. City Dep't of Personnel*, 855 F. Supp. 68 (S.D.N.Y. 1994), *aff'd*, 53 F.3d 565 (2d Cir. 1995), and *Jaramillo v. Professional Examination Service, Inc.*, 544 F. Supp. 2d 126 (D. Conn. 2008). However, the plaintiffs in both *Fink* and *Jaramillo* brought claims under Section 504 of the Vocational Rehabilitation Act, 29 U.S.C. § 794(a), which explicitly embraced a "reasonable accommodation" standard through its implementing regulations. *See* 45 C.F.R. § 84.12. This standard was borrowed and adopted for use in Title I of the ADA, which prohibits discrimination in employment by requiring employers to provide "reasonable accommodations" to qualified individuals with disabilities. *See* 42 U.S.C. § 12112(b)(5). As the Ninth Circuit explained in *Enyart*, however, Congress did not incorporate this standard into § 12189. *See* 630 F.3d at 1162. Therefore, the cases cited by Defendants that rely on this standard, such as *Carter v. Bennett*, 840 F.2d 63 (D.C. Cir. 1988), are not controlling. Furthermore, although Title II regulations do specify that public entities must make "reasonable modifications" to policies, practices, and

procedures, this general standard does not override the more specific regulatory guidance relating to the testing context.

Defendants next rely on regulatory guidance specifying that they are not required to give an examinee her requested accommodation. The Court agrees that the ADA does not require Defendants to provide Bonnette with the auxiliary aid that she requests. *See Burkhart v. Wash. Metro Area Transit Auth.*, 112 F.3d 1207, 1213 (D.C. Cir. 1997) ("Nothing in the ADA itself or its implementing regulations dictates that a disabled individual *must* be provided with the type of auxiliary aid or service he requests."). Although 28 C.F.R. § 35.160(b)(2) requires public entities to "give primary consideration to the requests of the individual with disabilities," an individual's request "need not be honored if 'another effective means of communication exists.'" *Burkhart*, 112 F.3d at 1213 (quoting 28 C.F.R. app. § 35.160). "Whether a particular form of communication is 'as effective' as another is not judged on an absolute scale, but rather is a contextual determination based on the type of communication and number of people involved as well as the importance of the communication." *Id.* (citing 28 C.F.R. app. § 35.160). In addition, the Court must consider factors such as the method of communication used by the individual and the nature, length, and complexity of the communication involved. 28 C.F.R. § 35.160(b)(2).

Defendants also cite regulatory guidance from the Justice Department explaining, in the context of Title III regulations applicable to public accommodations, that "[t]he auxiliary aid requirement is a flexible one" and that "[u]se of the most advanced technology is not required so long as effective communication is ensured." 28 C.F.R. pt. 36, App. B at 727-28 (2010). However, this guidance is not directly applicable here because § 12189, despite being housed in Title III, applies broadly to all "persons" and not just public accommodations. The Justice

Department has concluded that, "[b]ased on a careful review of the ADA legislative history, . . . Congress did not intend under title III to impose upon a public accommodation the requirement that it give primary consideration to the request of the individual with a disability." *Id.* at 728. The "primary consideration" requirement is a part of the Title II regulation, however, *see* 28 C.F.R. § 35.160(b)(2), and, as explained below, that requirement is arguably incorporated into § 12189 through the "best ensure" language in its implementing regulation.

Defendants also ask the Court to focus on regulatory guidance from the Equal Employment Opportunity Commission ("EEOC") regarding a provision in Title I of the ADA that defines discrimination to include:

> failing to select and administer tests concerning employment in the most effective manner to ensure that, when such test is administered to a job applicant or employee who has a disability that impairs sensory, manual, or speaking skills, such test results accurately reflect the skills, aptitude, or whatever other factor of such applicant or employee that such test purports to measure, rather than reflecting the impaired sensory, manual, or speaking skills of such employee or applicant (except where such skills are the factors that the test purports to measure).

42 U.S.C. § 12112(b)(7). The language in this provision is similar to that used in 28 C.F.R. § 36.309(b)(i), using the phrase "most effective" instead of "best ensure." The EEOC has explained that "[t]his provision does not require that an employer offer every applicant his or her choice of test format. Rather, this provision only requires that an employer provide, upon advance request, alternative, accessible tests to individuals with disabilities that impair sensory, manual, or speaking skills needed to take the test." 29 C.F.R. pt. 1630, App. at 386 (2010).

All of this guidance merely confirms that neither Title II nor Title III of the ADA requires Defendants to provide Bonnette with her requested accommodation simply because it is the accommodation she most prefers. It does not establish that Defendants' proffered alternatives are

sufficient as a matter of law. Although they differ slightly in their language, both the Title II regulations applicable to the Court of Appeals (through the "primary consideration" requirement) and the Title III regulation applicable to NCBE (through its "best ensure" requirement) require that Bonnette be provided with an accommodation that is at least "as effective" as her preferred accommodation. Therefore, if Bonnette can establish that the alternative accommodations offered to her by Defendants do not make the MBE accessible to her in the same way that JAWS does, then Defendants must provide her with JAWS unless they can establish that doing so would fundamentally alter the nature of the examination or constitute an undue burden.

As the D.C. Circuit noted in *Burkhart*, whether a particular accommodation is "as effective" as another depends on context. 112 F.3d at 1213. For example, in *American Association of People with Disabilities v. Shelley*, 324 F. Supp. 2d 1120 (C.D. Cal. 2004), cited by Defendants, the court ruled that Title II of the ADA did not require the State of California to maintain direct recording electronic voting systems that allowed visually impaired individuals to cast votes independently and secretly. The court explained that while "casting a vote independently and secretly would be preferred over casting a vote with the assistance of a family member or other aide[,] . . . the ADA does not require accommodation that would enable disabled persons to vote in a manner that is comparable in every way with the voting rights enjoyed by persons without disabilities." *Id.* at 1126.[4] Therefore, in the voting context, accommodations may be effective if they enable the voter to understand the choices on the ballot

---

[4] The Court notes that 28 C.F.R. § 35.160 was recently amended so as to require that auxiliary aids and services be provided "in such a way as to protect the privacy and independence of the individual with a disability." The amended regulation casts some doubt on the ongoing validity of the ruling in *Shelley*.

and cast a vote. By contrast, in the testing context, particularly with respect to tests like the MBE that assess critical reasoning skills, the information being conveyed is far more complex and voluminous and requires more extensive interaction by the individual with disabilities. Under such circumstances, it is essential that the content of the questions and the answer choices be communicated to the examinee in a clear and efficient manner so that the examinee can carefully evaluate the choices and select an answer within the time allotted for the examination. The Court must consider the effectiveness of Defendants' offered accommodations in this context.

5.     The Effectiveness of Accommodations Offered to Bonnette

Bonnette has provided the Court with a substantial amount of evidence indicating that a laptop equipped with JAWS would be the most effective accommodation for her visual impairment, as it would enable her to easily comprehend the test items on the MBE, scan through text like a sighted reader, reread critical portions of questions and answer choices, adjust the speed of her reading, pick up clues about the visual layout of the text, and focus on the content of the examination rather than on the method in which she is taking it. Defendants do not dispute the evidence provided by Bonnette that she is a visual learner and that JAWS is her primary reading method. Nor do Defendants deny that providing Bonnette with her requested accommodation would be the "best" outcome for her in terms of accommodating her visual impairment. Rather, Defendants argue that their alternative accommodations, i.e., a human reader or an audio CD[5], are adequate under the ADA and its implementing regulations.

Bonnette has explained why she believes that a human reader would not be an effective

_____

[5] Defendants do not argue that their other offered accommodations, such as a large print or Braille format examination, would be accessible to Bonnette.

32

accommodation for her. Bonnette has a documented history of difficulties communicating with human readers about how to read and reread text in an examination setting. Although Defendants have offered Bonnette an attorney as a reader and the opportunity to meet with the reader in advance of the examination, these proposals will not eliminate the difficulties associated with learning the speech patterns of the reader and adjusting to that method of reading during the course of the examination. The evidence in the record suggests that Bonnette will be at a significant disadvantage if forced to rely on a human reader because she will be distracted by this unnatural method of reading, meaning that her reading will be less automatic and may disrupt her critical reasoning skills, which are essential for any examinee taking the MBE. Defendants argue that Bonnette's history of using human readers on the LSAT, during law school, and for the California bar exam demonstrates that it is an appropriate accommodation for her. But the fact that Bonnette previously was required to rely on human readers does not establish that human readers would make the MBE accessible to her. The fact that Bonnette *could* take the MBE using a human reader does not mean that this accommodation would best ensure that her score reflected her achievement level rather than her visual impairment; Bonnette is entitled to an auxiliary aid that allows her to perform at her achievement level, not just one that might be good enough for her to pass. Furthermore, Title II regulations require that auxiliary aids be provided "in such a way as to protect the privacy and independence of the individual with a disability." 28 C.F.R. § 35.160(b)(2). Human readers offer less privacy and independence than either an audio CD or JAWS.

Because it offers Bonnette more control and independence than a human reader, an audio CD appears to be a much better auxiliary aid for her. However, Bonnette is not experienced at

using an audio CD, and even though she has been offered the opportunity to practice using an audio CD before taking the MBE, she is likely to have more difficulty using that method than she would with JAWS. Furthermore, the record indicates that JAWS provides Bonnette with much more control and functionality, such as the ability to skim text and the ability to learn clues about how the text is arranged visually on the page. As Dr. Britton persuasively explained in his declaration, the memory capacity and reasoning skills necessary to answer questions on the MBE require that an examinee be able to easily reread parts of the question and the answer choices. Due to Bonnette's fluency with JAWS, she is able to use that software to regress through text in a manner similar to that of a sighted reader. Using an unfamiliar reading method such as an audio CD would divert some of Bonnette's mental processing power to the method by which she was reading the examination rather than its contents.

Defendants argue that Bonnette cannot be certain that using JAWS will be better for her than using an audio CD or a human reader, citing social science research suggesting that blind individuals' preferences for a particular testing format do not always align with their performance. The studies cited by Defendants are inconclusive, however, and they do not directly address the circumstances presented by Bonnette in this specific case. Bonnette has provided the Court with declarations from several experts who have evaluated her personally and whose professional opinion is that Bonnette would be disadvantaged if she were required to use either a human reader or an audio CD for the MBE. Defendants object to this testimony as speculative, but the Court finds their testimony to be persuasive and credible, and the Court is satisfied that their opinions are sufficiently grounded on their individual evaluations of Bonnette

and/or their knowledge and experience in their relevant fields.[6]  The Court also notes that Defendants have not presented the Court with any expert testimony rebutting their findings.

In light of this evidence in the record regarding Bonnette's particular needs and the nature of the MBE, the Court finds that Bonnette is likely to succeed in demonstrating that the accommodations offered by Defendants are not accessible to her within the meaning of the applicable ADA regulations.  The Court notes that its determination is not final and is based on the present record submitted by the parties.  Ultimately, the parties may develop a more complete record regarding the effectiveness of the audio CD option compared to JAWS, which may result in a different determination.  But Bonnette need only demonstrate a substantial likelihood of success on the merits, and the Court finds that she has satisfied that threshold.

Defendants complain that if they are required to offer Bonnette the chance to take the MBE using JAWS, they will necessarily be required to provide Bonnette with another accommodation if, for example, she fails the MBE during the July 2011 administration and seeks to retake the MBE later with a slightly different version of the software.  As the Court explained above, however, the Court does not read the ADA regulations as requiring Defendants to offer Bonnette her requested accommodation in every instance.  In this case, Bonnette has limited her request to taking the MBE using a laptop equipped with JAWS (in addition to the other accommodations such as double time that have been granted by the Court of Appeals), and once Defendants offer that accommodation, they will have satisfied their obligations under the statute.

---

[6] Defendants argue that Fredric Schroeder lacks the requisite personal knowledge to opine on what accommodations will work best for Bonnette.  The Court does not rely on Schroeder's opinion regarding this issue because unlike Drs. Malkin and Britton, he has not personally examined Bonnette.

NCBE contends that even if Bonnette can establish that JAWS is the only effective accommodation for her, she is nevertheless unlikely to succeed on the merits of her ADA claim because offering that accommodation would amount to an undue burden on NCBE.[7] NCBE cites the cost and administrative burden of administering the exam securely as reasons for finding an undue burden. The Court is not persuaded by NCBE's argument. Although NCBE has raised some valid security concerns about offering the MBE in a computer-based format, the record suggests that NCBE is able to take measures to ensure that the exam is administered at least as securely as its paper-and-pencil version of the MBE. The Court is also not persuaded that the roughly $5000 cost of administering the MBE with JAWS constitutes an undue burden for an organization whose operating budget exceeds $12 million, particularly where those costs may covered by the Court of Appeals, which has not raised an undue burden argument in this specific case. Therefore, based on the present record, the Court finds that NCBE's undue burden defense is not strong enough to defeat Bonnette's claim.

For these reasons, the Court finds that Bonnette is likely to succeed on the merits of her claim. Because the undisputed facts do not establish that Defendants will prevail on the merits, the Court shall deny Defendants' motions for summary judgment. The Court shall now consider the other factors relevant to determining whether preliminary injunctive relief is warranted.

B.      *Irreparable Harm*

The second prong of the preliminary injunction analysis requires that the plaintiff demonstrate that she will likely suffer irreparable harm in the absence of an injunction. The

---

[7] Defendants could also prevail on the merits by demonstrating that JAWS would fundamentally alter the nature of the MBE. However, Defendants do not make this argument.

plaintiff must demonstrate that "[t]he injury complained of is of such *imminence* that there is a

'clear and present' need for equitable relief to prevent irreparable harm." *Chaplaincy of Full

Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (quoting *Wisc. Gas Co. v.

FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)). Furthermore, "the injury must be

beyond remediation." *Id.*

Bonnette contends that she will suffer irreparable injury in the absence of an injunction

because she will either be forced to take the July 2011 MBE under discriminatory conditions or

have to wait until at least the February 2012 administration while her claim is litigated. Because

Bonnette cannot practice law until she successfully passes the D.C. Bar Examination, any delay

in taking the MBE deprives her of time to practice her chosen profession. The lost opportunity to

engage in one's preferred occupation goes beyond monetary deprivation. *See Enyart*, 630 F.3d at

1166 (affirming finding of irreparable harm based on plaintiff's inability to practice law without

successfully passing bar examination).[8] Bonnette has been trying to become a licensed attorney

---

[8] Defendants cite several cases where the court found that the plaintiff would not suffer irreparable harm if denied the opportunity to sit for a bar examination. *See Kelly v. W. Va. Bd. of Law Examiners*, Civil Action No. 2:08-00933, 2008 WL 2891036 (S.D. W. Va. July 24, 2008); *O'Brien v. Va. Bd. of Bar Examiners*, No. 98-0009-A, 1998 WL 391019 (E.D. Va. Jan. 23, 1998); *Pazer v. N.Y. State Bd. of Law Examiners*, 849 F. Supp. 284 (S.D.N.Y. 1994). Two of these cases are factually distinguishable. In *O'Brien*, the court held that there was no irreparable harm because even if the plaintiff passed the bar exam, the state board of bar examiners could still deny him a license to practice law because he had failed to complete his character and fitness application. 1998 WL 391019 at *2. In *Pazer*, the court found there was no irreparable harm in part because the plaintiff had already obtained gainful employment with a law firm. *See* 849 F. Supp. at 288. In the third case, the court appears to have merged the irreparable harm inquiry with the merits inquiry, finding that there was no irreparable harm because the testing accommodations offered to the plaintiff were sufficient, and so it is less persuasive authority. *See Kelly*, 2008 WL 2891036 at *2.

for many years since she obtained her law degree, and this fact makes further delay *more* irremediable, not less as Defendants urge.  Furthermore, Bonnette has devoted substantial time and effort to preparing for the July 2011 MBE, which will have been effectively wasted if she must wait to take the test at a later date.  *See Agranoff v. Law Sch. Admission Council, Inc.*, 97 F. Supp. 2d 86, 88 (D. Mass. 1999) (finding irreparable harm based in part on the lost time and effort in preparing for an exam).  These considerations indicate that Bonnette will likely suffer irreparable harm if she unable to take the July 2011 MBE.

Defendants argue that Bonnette cannot show that she is likely to suffer irreparable harm because it is possible that she will pass the D.C. Bar Exam using either a human reader or an audio CD on the MBE.  *See, e.g.*, *Baer v. Nat'l Bd. of Med. Examiners*, 392 F. Supp. 2d 42, 48-49 (D. Mass. 2005) (noting that irreparable harm was uncertain because examinee might pass the test without her requested accommodation).  But forcing Plaintiff to take the MBE under discriminatory conditions is itself a form of irreparable injury.  *See Elder v. Nat'l Conference of Bar Examiners*, No. C 11-00199 SI, 2011 WL 672662, at *10 (N.D. Cal. Feb. 16, 2011) ("Taking the exam without a computer equipped with JAWS . . . would force [plaintiff] to take the exam under discriminatory circumstances–a result that, in and of itself would cause plaintiff irreparable harm.") (citing *Chalk v. United States Dist. Ct. Cent. Dist. of Cal.*, 840 F.2d 701 (9th Cir. 1988)); *D'Amico v. N.Y. State Bd. of Law Examiners*, 813 F. Supp. 217, 220 (W.D.N.Y. 1993) (finding that "ongoing discrimination [against plaintiff] based on her medical disability" constituted irreparable injury); *cf. Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) ("[T]he loss of constitutional freedoms, 'for even minimal periods of time, unquestionably

constitutes irreparable injury."). The Court credits Bonnette's testimony in her declaration that she will be humiliated and frustrated if she is required to take the MBE using a reading method that is not her natural reading method. Bonnette cannot recover damages for these harms, because the ADA provides that the sole remedy available to her is injunctive relief. *See* 42 U.S.C. § 12188(a). Therefore, the Court finds that Bonnette is likely to suffer irreparable harm in the absence of a preliminary injunction.

> C.      *Balance of the Equities*

The third factor the Court must consider is the balance of the equities. As noted above, Bonnette is likely to suffer irreparable harm if the Court does not grant a preliminary injunction. Defendants argue that they too will suffer serious harms if the Court orders them to make the MBE available to Bonnette on a laptop equipped with JAWS. Specifically, NCBE has complained that it will be taking a security risk in making the MBE available in a computer-based format and that it will incur substantial costs. However, NCBE has previously offered the MBE in this format pursuant to court orders, and the record indicates that NCBE can offer the MBE securely on its own laptops and with appropriate protocols. Furthermore, Defendants will not be unfairly burdened by the costs of providing the MBE because Bonnette has volunteered to post a $5000 bond to cover the estimated costs. Therefore, the Court finds that the balance of the equities strongly favors Bonnette.

> D.      *Public Interest*

The final factor in the preliminary injunction analysis is the public interest. Bonnette contends that the public interest supports issuance of an injunction because the public has a strong interest in ensuring that the antidiscrimination aims of the ADA are satisfied. Defendants

argue that the public also has an interest in ensuring that the attorney licensure process is secure and reliable.  However, as noted above, the Court is not persuaded that the security of the MBE will be compromised if Defendants are required to provide the exam to Bonnette in a computer-based format because there are measures that can be taken to administer the exam securely. Therefore, the Court finds that the public interest factor tips in favor of Bonnette.

## IV.  CONCLUSION

Based on the foregoing analysis, the Court finds that Bonnette is likely to succeed on the merits of her claim; that Bonnette is likely to suffer irreparable harm if injunctive relief is not granted; that the balance of the equities tips in Bonnette's favor; and that the public interest supports the issuance of a preliminary injunction.  Therefore, the Court concludes that Bonnette has satisfied the requirements for preliminary injunctive relief, and the Court shall order Defendants to offer Bonnette the opportunity to take the MBE using a laptop equipped with JAWS during the July 2011 administration of the D.C. Bar Examination.  The Court shall order Bonnette to post a $5000 bond to cover the costs of compliance with the injunction.  Because the Court finds that Bonnette has stated a claim against NCBE, the Court shall deny NCBE's motion to dismiss.  The Court shall also deny Defendants' motions for summary judgment because the undisputed facts do not establish that Defendants are entitled to relief.  An appropriate Order accompanies this Memorandum Opinion.


Date:   July 13, 2011


_____/s/_____
COLLEEN KOLLAR-KOTELLY
United States District Judge